# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN J. BURDEN and JACQUELINE S. BURDEN, Derivatively on Behalf of General Electric Company,<br><br>Plaintiffs,<br><br>v.<br><br>SEBASTIEN M. BAZIN, W. GEOFFREY BEATTIE, JEFFREY S. BORNSTEIN, JOHN J. BRENNAN, JAMES I. CASH, JR., H. LAWRENCE CULP, MARIJN E. DEKKERS, FRANCISCO D'SOUZA, JOHN L. FLANNERY, EDWARD P. GARDEN, JAN R. HAUSER, PETER B. HENRY, SUSAN J. HOCKFIELD, THOMAS W. HORTON, JEFFREY R. IMMELT, ANDREA JUNG, ROBERT W. LANE, RISA LAVIZZO-MOUREY, RICHARD A. LAXER, ROCHELLE B. LAZARUS, CATHERINE LESJAK, LOWELL C. MCADAM, JAMIE S. MILLER, STEVEN M. MOLLENKOPF, JAMES J. MULVA, PAULA ROSPUT REYNOLDS, JAMES E. ROHR, MARY L. SCHAPIRO, LESLIE SEIDMAN, KEITH S. SHERIN, ROBERT J. SWIERINGA, JAMES S. TISCH, DOUGLAS A. WARNER III, and ASHTON CARTER,<br><br>Defendants<br><br>-and-<br><br>GENERAL ELETRIC COMPANY, a New York corporation,<br><br>Nominal Defendant | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiffs Stephen J. Burden and Jacqueline S. Burden ("Plaintiffs"), by and through their undersigned counsel, bring this shareholder derivative action in the name and on behalf of nominal defendant General Electric Company ("GE" or the "Company") against defendants Sébastien M. Bazin, W. Geoffrey Beattie, Jeffrey S. Bornstein, John J. Brennan, James I. Cash, Jr., H. Lawrence Culp, Marijn E. Dekkers, Francisco D'Souza, John L. Flannery, Edward P. Garden, Jan R. Hauser, Peter B. Henry, Susan J. Hockfield, Thomas W. Horton, Jeffrey R. Immelt, Andrea Jung, Robert W. Lane, Risa Lavizzo-Mourey, Richard A. Laxer, Rochelle B. Lazarus, Catherine Lesjak, Lowell C. McAdam, Jamie S. Miller, Steven M. Mollenkopf, James J. Mulva, Paula Rosput Reynolds, James E. Rohr, Mary L. Schapiro, Leslie Seidman, Keith S. Sherin, Robert J. Swieringa, James S. Tisch, Douglas A. Warner III, and Ashton Carter (collectively, the "Individual Defendants," and, together with GE, the "Defendants") for breaches of fiduciary duty, unjust enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and other violations of law.[1]

Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon due investigation by counsel,

---

[1]    Bornstein, Flannery, Hauser, Immelt, Laxer, Miller, and Sherin are referred to herein as the "Executive Defendants" and the remaining Individual Defendants are referred to herein as the "Board Members." Bazin, Beattie, Brennan, Cash, Culp, Dekkers, D'Souza, Flannery, Garden, Henry, Hockfield, Horton, Immelt, Jung, Lane, Lavizzo-Mourey, Lazarus, McAdam, Mollenkopf, Mulva, Reynolds, Rohr, Schapiro, Seidman, Sherin, Swieringa, Tisch, and Warner are referred to herein as the "Waste Defendants." Bazin, Beattie, Bornstein, Brennan, Cash, Culp, Dekkers, D'Souza, Flannery, Garden, Henry, Hockfield, Horton, Immelt, Jung, Lane, Lavizzo-Mourey, Lazarus, McAdam, Miller, Mollenkopf, Mulva, Reynolds, Rohr, Schapiro, Seidman, Sherin, Swieringa, Tisch, and Warner are referred to herein as the "Unjust Enrichment Defendants." Schapiro, Beattie, Henry, Mulva, Rohr, Brennan, Seidman, Lavizzo-Mourey, Horton, Reynolds, Culp, Bazin, Carter, D'Souza, Garden, Lesjak, and Tisch are referred to herein as the "Demand Defendants." Flannery, Bazin, Beattie, Brennan, D'Souza, Dekkers, Garden, Henry, Hockfield, Jung, Lavizzo-Mourey, Lazarus, Mollenkopf, Mulva, Rohr, Schapiro, Tisch, Miller, Immelt, and Bornstein are referred to herein as the "Exchange Act Defendants."

including, but not limited to: (a) review and analysis of public filings made by GE and other persons with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, financial statements, and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review and analysis of news articles, shareholder communications, and postings on GE's website concerning the Company's public statements; (d) review and analysis of court filings in the related consolidated securities class action lawsuit alleging violations of federal securities law based on similar facts and circumstances alleged herein, styled *Ap-Fonden v. General Electric Company*, Case No. 1:17-cv-8457-JMF (S.D.N.Y.) (the "Securities Class Action");[2] and (e) review and analysis of other publicly available information concerning GE, the Individual Defendants, and other persons.

## INTRODUCTION AND OVERVIEW

1.     This is a verified shareholder derivative action brought by Plaintiffs, shareholders of GE, on behalf of the Company and its shareholders, against certain current and former officers and directors of GE to remedy, *inter alia*, the massive mismanagement of the Company, breaches of fiduciary duty, including the duty of loyalty and unjust enrichment, waste of the Company's assets, violations of Section 14(a) of the Exchange Act, and deliberate concealment of such wrongful conduct during the period from approximately February 26, 2013 through the present (the "Relevant Period").

2.     As described in more detail below, certain of the Individual Defendants engaged in a fraudulent scheme and course of conduct designed to hide the truth about the Company's

---

[2]     The allegations from the Fifth Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed in the Securities Class Action on October 25, 2019 (the "Securities Action Complaint"), which is attached hereto as Exhibit 1, are hereby incorporated into this Complaint.

financial health and growth prospects, by causing the Company to omit the truth about its division GE Capital Global Holdings, LLC's ("GE Capital") exposure under its long term care ("LTC") insurance policies, and by causing the Company to create an illusory revenue recognition scheme in order to meet its earnings targets by manipulating the value of the contract assets of GE Power, a wholly-owned subsidiary of GE.

3.      Traditionally, many investors' reason for owning GE common stock has been its consistent and reliable stream of quarterly dividends and ability to fund its stock buyback program. Throughout its history prior to the Relevant Period, GE almost always managed to maintain sufficient cash flow to meet its quarterly dividend payments.  The majority of these dividends and buyback funds are funded by flow-through dividend payments from GE Capital, which is the business segment of GE that provides commercial lending and leasing and other financial products, and cash from GE's industrial operations, principally from GE Power, which builds products and technologies to produce electric power for the energy industry.

4.      Between the late 1980s and early 2000s, GE Capital underwrote and reinsured LTC insurance policies to insure costs associated with assisted living, specialized skilled care facilities, and other related expenses.  Pricing assumptions of such policies fluctuate around the cost of healthcare, life expectancy, and interest rates.  Despite significant changes in the average American life expectancy in the mid-2000's that affected these pricing assumptions, and despite the long history of insurance companies facing substantial losses relating to their LTC policies of which the Individual Defendants were undoubtedly aware (including, most notably, GE's own former subsidiary Genworth Financial Inc. ("Genworth")), the Individual Defendants failed to disclose these known LTC-related trends, uncertainties, and commitments that were likely to have a significant negative impact on GE's financial condition in the Company's SEC filings.  Further,

the Individual Defendants failed to update reserve assumptions for the LTC policies and even falsely created an impression that GE had sold its insurance business, by excluding its remaining LTC liabilities from SEC filings.

5.      Another segment upon which GE's cash flow needs relied was GE Power – GE's largest industrial segment and a key profitability indicator of the Company.  GE Power's core business operation is building large-scale power generation facilities along with providing maintenance services with long-term service agreements ("LTSAs") to these facilities.

6.      During the Relevant Period, similar to problems experienced by GE Capital, GE Power was also facing a global downturn in the power industries.  GE was reporting LTSAs as contract assets and generating a non-cash revenue; in other words, it was recognizing revenues under the LTSAs before the actual billing of the customers or receipt of any payment. In order to increase revenues and meet its earnings targets, GE heavily relied upon cumulative catch-up adjustments, which enabled GE to record adjustments to reflect purported changes in the estimated profitability of its LTSAs.  Essentially, the Individual Defendants utilized the long-term nature of the LTSAs to artificially inflate GE Power's contract assets and therefore inflated its revenues and profits.

7.      Further, upon announcement of new accounting rules in May 2014, GE Power began factoring – or selling – its LTSA receivables to GE Capital in order to conceal its growing cash flow problems. By utilizing this strategy, the Individual Defendants were able to prevent investors from noticing the gap between GE Power's reported revenue and its Industrial Cash Flow from Operating Activities ("ICFOA"), which is a measurement of cash that is actually received for services provided.

8.      Defendants' fraud began to unravel in early 2017, as the partial truth regarding

GE's cash flow issues, mismanagement of its LTC reserves, and GE Power's earnings issues emerged.  Through a series of disclosures in mid-2017 through early 2018, GE shocked the market by revealing massive ICFOA declines and billions of dollars in unexpected LTC exposures, and cut its annual dividend for the first time since the Great Depression by 50% on November 13, 2017.  Then, in January 2018, the Company announced that GE Capital would be required to allocate $15 billion for its LTC reserves for seven years and would be suspending its dividend to GE for the "foreseeable future."

9.     The following month, GE disclosed that the SEC had been investigating GE's revenue recognition practices and internal controls over financial reporting relating to LTSAs since November 2017, and that it had recently widened its investigation to include the LTC reserve increase that GE had announced in January 2018.  The Company also disclosed later that the Department of Justice ("DOJ") was (and apparently still is) investigating these issues.

10.     In June 2018, because of the massive drops in GE's stock price, GE was kicked out of the elite Dow Jones Industrial Average ("DJIA"), of which it had been a member since its inception in 1907.

11.     Then, on October 1, 2018, the Company announced a shocking $23 billion non-cash goodwill impairment charge for the Power business – essentially wiping out the entire balance of GE Power's goodwill balance – and slashed its quarterly dividend to just a penny.  That same day, GE abruptly removed Defendant Flannery as Chairman and Chief Executive Officer ("CEO") – after only a little more than a year on the job – and installed Defendant Culp as his successor. Following this news, the SEC expanded the scope of its investigation to encompass the expected goodwill impairment charge related to GE Power.

12.     The executive departures continued, with GE suddenly announcing on July 31,

2019 that Defendant Miller was resigning as Chief Financial Officer ("CFO").  Miller's resignation was followed by serious accusations of accounting fraud within the Company. On August 15, 2019, a bombshell report was released by Harry Markopolos – a former securities industry executive and a forensic accounting and financial fraud investigator – who concluded that GE's accounting fraud was "bigger than Enron and WorldCom combined."

13.     As a result of Defendants' wrongdoing, numerous lawsuits have been filed against them – including the Securities Class Action currently pending in this court, which alleges that between February 27, 2013 and January 23, 2018 certain of the Individual Defendants engaged in a fraudulent scheme and course of conduct designed to hide the truth about the Company's financial health and growth prospects in violation of federal securities law – based primarily upon defendants' failure to disclose GE's factoring of LTSAs.  *Sjunde AP-Fonden v. GE*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019).  In denying the defendants' motion to dismiss on August 29, 2019, the Securities Class Action court specifically found that plaintiffs "hit the mark" by alleging that "GE failed to disclose that GE Power generated [cash] by 'monetizing' receivables through extensive factoring of LTSAs," and found a "strong inference" that "GE and at least some of the Individual Defendants were at least consciously reckless" with respect to their failure to provide adequate disclosures to investors. *Id.* at 408-09.

14.     Most recently, on September 30, 2020, the SEC staff issued a "Wells notice" to GE, advising that it is considering recommending that the SEC bring a civil injunctive action against GE for possible violations of securities laws related to "historical premium deficiency testing for GE Capital's run-off insurance operations, as well as GE's disclosures relating to such run-off insurance operations."  In its 10-Q for the third quarter of 2020, filed on October 28, 2020, the Company disclosed that it has "recorded a reserve of $100 million as of September 30, 2020"

related to the SEC investigation.

15.     Even this extensive reserve would prove woefully inadequate.  On December 9, 2020, the SEC released an Order Instituting Cease-and-Desist Proceedings, Pursuant to Section 8a of the Securities Act of 1933 and Section 21c of the Securities Exchange Act Of 1934, Making Findings, and Imposing Remedial Sanctions and A Cease-and-Desist Order in In the Matter of General Electric Company, No. 3-20165 (the "SEC Order").  Pursuant to the SEC Order, the Company reached a ***$200 million*** settlement with the SEC for its alleged disclosure failures within GE Power and GE Capital.

16.     As a result of the Individual Defendants' conscious and willful breaches of their fiduciary duties and other malfeasance, GE has been damaged.  Ultimately, GE has lost over $100 billion in market capitalization, was removed from the DJIA (which it had occupied for over a century), and numerous executives were fired.  GE's stock price has failed to recover to this day. Further, GE has expended and will continue to expend significant sums of money, including but not limited to (i) costs incurred in defending and paying any settlements in the various lawsuits filed against the Company, (ii) costs incurred from defending and responding to the SEC and DOJ investigations, including the $200 million payment pursuant to the SEC Order; (iii) overcompensation of the Individual Defendants, and (iv) costs incurred from lack of proper funding of GE's LTC reserves.

17.     Efforts to avoid liability for this scheme continue through the present, as the Demand Defendants, including GE's Board of Directors (the "Board"), have acted in bad faith by wrongfully refusing Plaintiffs' November 14, 2018 letter demanding, among other things, that they institute this litigation (the "Litigation Demand").  Indeed, on December 31, 2020, after nearly two years and countless updates from Plaintiffs regarding the additional evidence of and ongoing

damage to GE caused by the Individual Defendants' wrongdoing, the Demand Defendants finally responded that they were refusing to undertake any of the actions detailed in the Litigation Demand purportedly because "the Company has no sound legal basis" to assert such claims and that, "even if there were a sound legal basis to assert claims, any such litigation would not be in the best interest of the Company and its stockholders." The Demand Defendants' significantly delayed and perfunctory response is impossible to reconcile with the fact that the Securities Class Action court has already found such allegations sufficiently plausible to pass muster under heightened pleading requirements and, just weeks before, the Company paid $200 million to settle similar claims brought by the SEC. The only possible conclusion is that the Demand Defendants acted in bad faith and in breach of their fiduciary duties in purporting to investigate and consider the Litigation Demand, while in fact intending to reject the Litigation Demand from the outset.

18.     Because the Demand Defendants have wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused GE.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court also has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

21.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §§ 1367(a) and (b).

9

22.     This Court has jurisdiction over Defendants because each Defendant named herein is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides in or maintains executive offices in this District, (ii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GE, occurred in this District, and/or (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.  Further, GE's common stock trades on the New York Stock Exchange, located within this District.

## THE PARTIES

24.     Plaintiffs Stephen J. Burden and Jacqueline S. Burden are current GE shareholders and have continuously been shareholders since at least June 1, 1983. Plaintiffs are citizens of Colorado.

25.     Nominal Defendant GE is a New York corporation maintaining its corporate headquarters in Boston, Massachusetts, and thus is a citizen of both New York and Massachusetts. GE is a global conglomerate that operates along various business segments, two of which are relevant here: (1) GE Capital, which used to be a wholly-owned subsidiary, and is now a division, of GE that provides commercial lending and leasing and other financial services; and (2) GE Power, a wholly-owned subsidiary of GE that builds products and technologies to produce electric power for the energy industry. GE's common shares trade on the NYSE under the symbol "GE."

GE is a defendant in the Securities Class Action.

26.     Defendant Bazin has been on GE's Board of Directors since 2016.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Bazin received total compensation in 2016, 2017, and 2018 of $189,254, $309,726, and $306,888, respectively.  On information and belief, Bazin is a citizen of California.

27.     Defendant Beattie was on GE's Board of Directors from 2009 to May 2019.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Beattie received total compensation in 2016, 2017, and 2018 of $346,321, $328,828, and $347,930, respectively.  On information and belief, Beattie is a citizen of Massachusetts.

28.     Defendant Bornstein was appointed Senior Vice President and CFO of GE, effective July 1, 2013, replacing Defendant Sherin, and served in that role until October 31, 2017.  Bornstein also served as a member of GE Capital's Board from 2006 through 2015 and as CFO of GE Capital from 2008 until his elevation to CFO of GE in 2013.  In connection with replacing Immelt with Flannery as GE's new Chairman and CEO, GE's Board also appointed Bornstein as Vice Chairman of GE, effective June 12, 2017.  But shortly thereafter, on October 6, 2017, GE announced that Bornstein's term as Vice Chairman would abruptly conclude at the end of the year.  Bornstein is a defendant in the Securities Class Action.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Bornstein received total compensation in 2014, 2015, 2016, and 2017 of $10,635,919, $11,497,856, $7,081,503, and $10,835,590 respectively.  On information and belief, Bornstein is a citizen of Connecticut.

29.     Defendant Brennan was on GE's Board of Directors from 2012 to December 10, 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Brennan received total compensation in 2016, 2017, and 2018 of $397,272,

$380,374, and $308,774.  On information and belief, Brennan is a citizen of Pennsylvania.

30.    Defendant Cash was on GE's Board of Directors from 1997 to April 2016.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Cash received total compensation in 2016 of $1,127,026.  On information and belief, Cash is a citizen of Florida.

31.    Defendant Culp has been on GE's Board of Directors since April 25, 2018, and has been Chairman and CEO since September 30, 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Culp received total compensation in 2018 of $15,398,827.  On information and belief, Culp is a citizen of Virginia.

32.    Defendant Dekkers was on GE's Board of Directors from 2012 to April 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Dekkers received total compensation in 2016, 2017, and 2018 of $319,033, $331,017, and $1,113,311.  On information and belief, Dekkers is a citizen of New Hampshire.

33.    Defendant D'Souza has been on GE's Board of Directors since 2013.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, D'Souza received total compensation in 2016, 2017, and 2018 of $320,149, $290,105, and $299,642.  On information and belief, D'Souza is a citizen of New Jersey.

34.    Defendant Flannery was GE's Chief Executive Officer ("CEO") from August 1, 2017 to September 30, 2018, when Culp was appointed to replace him, was on GE's Board of Directors from 2017 to October 2018, and was Chairman of the Board from January 2018 to October 2018.  Flannery is a defendant in the Securities Class Action.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Flannery received total compensation in 2017 and 2018 of $9,000,603 and $16,643,290, respectively.  On information and

belief, Flannery is a citizen of Massachusetts.

35.   Defendant Garden has been on GE's Board of Directors since 2017.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Garden received total compensation in 2017 and 2018 of $80,719 and $328,846, respectively.  On information and belief, Garden is a citizen of Connecticut.

36.   Defendant Hauser joined GE as Vice President-Controller and Chief Accounting Officer ("CAO"), effective April 15, 2013, and remained in that role until September 10, 2018, when he retired and was replaced by non-party Thomas S. Timko.  Hauser is a defendant in the Securities Class Action.  On information and belief, Hauser is a citizen of Massachusetts.

37.   Defendant Henry was on GE's Board of Directors from 2016 to April 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Henry received total compensation in 2016, 2017, and 2018 of $141,254, $307,755, and $115,311, respectively.  On information and belief, Henry is a citizen of New York.

38.   Defendant Hockfield was on GE's Board of Directors from 2006 to April 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Hockfield received total compensation in 2016, 2017, and 2018 of $286,311, $306,726, and $1,108,947, respectively.  On information and belief, Hockfield is a citizen of Massachusetts.

39.   Defendant Horton has been on GE's Board of Directors since 2018, and was elected lead director on October 2, 2018.  Horton was initially on the Special Committee, but was replaced by Reynolds in December 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Horton received total compensation in 2018 of $256,460.  On information and belief, Horton is a citizen of Texas.

40.   Defendant Immelt served as Chairman of GE's Board of Directors from September

7, 2001 to October 7, 2017, when he abruptly resigned three months earlier than expected and was replaced by Flannery.  Immelt also served as GE's CEO from September 2001 through July 31, 2017, and was a member of GE Capital's Board from 1998 through 2015. Immelt is a defendant in the Securities Class Action.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Immelt received total compensation in 2014, 2015, 2016, and 2017 of $18,855,141, $26,831,472, $17,962,122, and $4,982,197 respectively.  On information and belief, Immelt is a citizen of South Carolina.

41.     Defendant Jung was on GE's Board of Directors from 1998 to April 2018.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Jung received total compensation in 2016, 2017, and 2018 of $322,948, $332,610, and $1,119,487, respectively.  On information and belief, Jung is a citizen of New Jersey.

42.     Defendant Lane was on GE's Board of Directors from 2005 to October 9, 2017.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Lane received total compensation in 2016 and 2017 of $311,035 and $1,223,177, respectively.  On information and belief, Lane is a citizen of Illinois.

43.     Defendant Lavizzo-Mourey has been on GE's Board of Directors since 2017.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Lavizzo-Mourey received total compensation in 2017 and 2018 of $176,036 and $309,633, respectively.  On information and belief, Lavizzo-Mourey is a citizen of Pennsylvania.

44.     Defendant Laxer was the President and CEO of GE Capital from September 2016 until his retirement from GE, which was announced in December 2017 and became effective on March 31, 2018.  Between 2009 and September 2016, Laxer held a number of senior roles within GE Capital and was the CEO of GE Capital International prior to becoming the President and CEO

of GE Capital. Laxer is a defendant in the Securities Class Action.  On information and belief,
Laxer is a citizen of New York.

45.     Defendant Lazarus was on GE's Board of Directors from 2000 to April 2018.  In
exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders,
Lazarus received total compensation in 2016, 2017, and 2018 of $314,495, $331,017, and
$1,113,311, respectively.  On information and belief Lazarus is a citizen of New York.

46.     Defendant Lesjak has been on GE's Board of Directors since 2019.  On information
and belief, Lesjak is a citizen of California.

47.     Defendant McAdam was on GE's Board of Directors from 2016 to December 8,
2017.   In exchange for their purported trust, loyalty, and fidelity to the Company and its
shareholders, McAdam received total compensation in 2016 and 2017 of $173,625 and $281,338,
respectively.  On information and belief, McAdam is a citizen of New York.

48.     Defendant Miller served as GE's CFO from November 1, 2017, when she replaced
Bornstein, until March 2020, when she was replaced by non-party Carolina Dybeck Happe.[3]
Miller joined GE in 2008 as Vice President, Controller, and Chief Accounting Officer.  She became
GE's Senior Vice President and Chief Information Officer in 2013 and became President and CEO
of GE Transportation in 2015.  Miller is a defendant in the Securities Class Action.  In exchange
for their purported trust, loyalty, and fidelity to the Company and its shareholders, Miller received
total compensation in 2017 and 2018 of $5,057,861 and $7,401,678, respectively.  On information
and belief, Miller is a citizen of Massachusetts.

49.     Defendant Mollenkopf was on GE's Board of Directors from 2016 to April 2018.

---

[3]     On July 31, 2019, GE announced that Miller would be stepping down as CFO, but would
remain in the position until the Company could find a replacement.

In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Mollenkopf received total compensation in 2016, 2017, and 2018 of $34,288, $278,833, and $104,173. On information and belief, Mollenkopf is a citizen of California.

50.     Defendant Mulva was on GE's Board of Directors from 2008 to May 2019. In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Mulva received total compensation in 2016, 2017, and 2018 of $325,915, $344,598, and $333,831, respectively. On information and belief, Mulva is a citizen of Wisconsin.

51.     Defendant Reynolds has been on GE's Board of Directors since 2018. Reynolds replaced Horton as the third member of the Special Committee in December 2018. In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Reynolds received total compensation in 2018 of $35,285. On information and belief, Reynolds is a citizen of Washington.

52.     Defendant Rohr was on GE's Board of Directors from 2013 to April 2018. In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Rohr received total compensation in 2016, 2017, and 2018 of $398,732, $361,143, and $1,139,799, respectively. On information and belief, Rohr is a citizen of Pennsylvania.

53.     Defendant Schapiro was on GE's Board of Directors from 2013 to April 2018. In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Schapiro received total compensation in 2016, 2017, and 2018 of $329,998, $311,797, and $1,128,546, respectively.  On information and belief, Schapiro is a citizen of the District of Columbia.

54.     Defendant Seidman has been on GE's Board of Directors since 2018. In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Seidman

received total compensation in 2018 of $257,559.  On information and belief, Seidman is a citizen of Connecticut.

55.     Defendant Sherin served as CFO of GE from 1999 until July 2013, when he became GE Capital's Chairman and CEO.  Sherin held both positions until he resigned, effective September 1, 2016.  Sherin also served as Vice Chairman of GE from 2007 until December 31, 2016.  Sherin is a defendant in the Securities Class Action.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Sherin received total compensation in 2014, 2015, and 2016 of $11,887,684, $19,087,703, and $17,609,982, respectively.   On information and belief, Sherin is a citizen of Florida.

56.     Defendant Swieringa was on GE's Board of Directors from 2002 to April 2016.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Swieringa received total compensation in 2016 of $1,130,274.   On information and belief, Swieringa is a citizen of New York.

57.     Defendant Tisch has been on GE's Board of Directors since 2010.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Tisch received total compensation in 2016, 2017, and 2018 of $270,630, $285,047, and $309,285, respectively.  On information and belief, Tisch is a citizen of New York.

58.     Defendant Warner was on GE's Board of Directors from 1992 to April 2016.  In exchange for their purported trust, loyalty, and fidelity to the Company and its shareholders, Warner received total compensation in 2016 of $1,120,685.  On information and belief, Warner is a citizen of Michigan.

59.     Defendant Carter has been on GE's Board of Directors since 2020.  On information and belief, Carter is a citizen of Virginia.

## SUBSTANTIVE ALLEGATIONS

A. **Defendants Mislead Investors Regarding GE's LTC Reserves and GE Capital's Overall Financial Status**

60.     Between the late 1980s and early 2000s, GE Capital underwrote and reinsured LTC insurance policies to insure costs associated with assisted living, specialized skilled care facilities, and other related expenses.

61.     Pursuant to GAAP, insurance companies that insure or reinsure LTC policies – such as GE – are required to review mortality rates, healthcare costs, claims experience, and interest rates and to allocate their cash reserves accordingly.

62.     Additionally, pursuant to regulations promulgated by the SEC, GE is required to include disclosures about its LTC insurance policy-based liabilities in its quarterly and annual reporting, which must include information related to claims paid in the same accounting period, expectations for concerning events, circumstances creating liability, and the eventual payment of future claims.

63.     Pricing assumptions of LTC policies fluctuate based on the cost of healthcare, life expectancy, and interest rates.  In the mid-2000s, LTC insurance businesses faced substantial changes in these trends as a result of an increase in the average American life span and, as a result, many insurers experienced substantial loses and were forced to increase their premiums and update their pricing assumptions significantly.

64.     The Individual Defendants would have been very familiar with this phenomenon. After GE spun off its life and mortgage insurance unit Genworth in 2014, a securities class action was filed against Genworth for its inadequate cash reserves on its LTC policies, and Genworth

was forced to increase its LTC reserves by $435 million after it settled the class action.[4]

65.     Nevertheless, while significant changes were being made in the entire LTC insurance industry by other LTC providers, GE retained its position without making any substantial changes in its cash reserve assumptions for its LTC policies.

66.     Further, as part of concealing the Company's LTC liability, the Individual Defendants caused the Company to misrepresent GE Capital's insurance portfolio and create a false impression that GE had sold its insurance business, excluding its remaining LTC liabilities from SEC filings.

67.     For example, on December 18, 2013, in its Annual Investor Outlook Meeting, Defendant Immelt reassured investors by stating "[w]e've sold Plastics, and we sold NBC and we've sold the North American Retail Finance business, we've sold reinsurance business, the insurance business, the bond insurance business."

68.     Similarly, on December 16, 2014, in GE's annual guidance and update call with analysts and investors, Immelt stated that GE had achieved its "risk reduction" goal to "[s]ell insurance before the storm."  During the same call, Immelt further stated that "we exited insurance in time."

69.     On February 26, 2013, GE filed its Form 10-K for the fiscal year ended December 31, 2012 with the SEC, which was signed by Defendants Immelt, Miller, and Sherin, and certified by Immelt and Sherin.  Contrary to the Company's previous filings, and without any explanation, LTC liabilities were suddenly excluded from GE's Disclosed Insurance Liabilities.

70.     LTC liabilities continued to be excluded from GE's SEC filings during the Relevant Period.  This exclusion enabled the Individual Defendants to decrease Disclosed Insurance

---

[4]     *In re Genworth Fin. Sec. Litig.*, No. 1:14-cv-2392-AKH (S.D.N.Y.).

Liabilities.  In fact, disclosed LTC liabilities totaled $22 billion as of December 31, 2008, $23.7 billion as of 2011, and with the exclusion, dropped to $14 billion as of February 26, 2013.  In 10-Ks for fiscal years 2013, 2014, 2015, and 2016, Disclosed Insurance Liabilities were listed as $13.5 billion, $12.6 billion, $11.5 billion, and $11.1 billion, respectively.[5]

71.     The Individual Defendants also caused the Company to mislead the investing public with their statements about GE Capital's overall financial status.  On April 19, 2013, during the Company's first quarter 2013 earnings call, Immelt stated, "GE Capital delivered a solid quarter, up 9% while they continue to shrink their non-core assets, which were down $17 billion in the quarter versus previous years."  Sherin added, "[w]e have got over $60 billion of noncore assets. We continue to run those off."

72.     During the Sanford C. Bernstein Strategic Decisions Conference the following month, former Chairman and CEO of GE Capital, Michael Neal, stated that "we have made [GE Capital] smaller.  We have made it safer.  We have made it more core."  He further described GE Capital's remaining portfolio as "our best stuff" and claimed that it "is very safe for us and we err on the side of being safe and being secure."

73.     The Individual Defendants caused the Company to create an illusion that GE was lowering GE Capital's risks.  On April 10, 2015, during a specially convened call with investors, Sherin stated "[a]s you all know, we have done a lot over the last six years to shrink GE Capital while also making it much safer."

74.     During the Company's April 22, 2015 Annual Shareholders Meeting, Defendant Bornstein stated that "the businesses that you'll be left with will be those businesses that are

_____

[5]     The Form 10-Ks that were filed with the SEC in 2014, 2015, 2016, and 2017 were all signed by Defendants Immelt, Hauser, and Bornstein.

synergistically aligned to our industrial businesses and provide real competitive advantage and, importantly, from a capital allocation perspective, generate a return that's well in excess of our cost of capital."

75.     All of these statements were false and misleading because they obscured that, like the LTC market generally, GE's reinsured LTC portfolio had significantly deteriorated both before and throughout the Relevant Period.   The Individual Defendants made no mention of and intentionally omitted these material facts, risks or trends, and their likely severe negative impact on the Company's financial condition.   The Company's SEC filings throughout the Relevant Period similarly omitted such information and thus were also false and misleading.  Indeed, rather than disclosing the Company's true state of affairs to the public, the Individual Defendants changed the manner in which GE reported its LTC insurance risks to investors in violation of SEC regulations, mischaracterized the Company's LTC risk exposure as "life insurance," and continued to falsely represent that the Company had reduced such risks and that any remaining exposure was immaterial and would be "run off" over time.

76.     These misleading statements continued throughout the Relevant Period, with the Individual Defendants continually presenting GE Capital as a strong and solid segment of GE while downplaying the riskiness of its portfolio.

77.     During the June 1, 2016 Sanford C. Bernstein Strategic Decisions Conference, for instance, Defendant Sherin stated "[a]ssets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity.  That's up substantially from where it was when we were designated.  And we are not just smaller; we exited whole pools of risk."

78.     Only 10 months before it was revealed that GE Capital would be required to allocate $15 billion for the statutory LTC reserves for seven years and would suspend its dividend

to GE for the "foreseeable future," on March 13, 2017, Defendant Laxer, then-CEO of GE Capital, continued to mislead investors and analysts by stating that it would not be "attractive" for GE to sell its run-off insurance portfolio "given the interest rate environment we are in right now."  After that statement, a J.P. Morgan analyst cited these representations in a report he issued that day, stating, "[o]n the insurance liabilities assets, GE noted that it's not attractive to exit this business in the current rate environment and would need a couple more increases in rates to start considering a move."

79.     These statements were similarly false and misleading because they misrepresented the toxic nature and extent of GE's LTC risks, which were certain to have a significant, negative impact on the Company's financial performance.

**B.**   **The Individual Defendants Concealed GE's Massive Long-Term Liabilities and Material Risks Related to GE Power and its Long-Term Service Agreements**

80.     In addition to the guarantees that were made regarding GE Capital specifically, the Individual Defendants were also making assurances regarding GE's entire portfolio, including GE Power.

81.     During GE's Annual Outlook Investor Meeting on December 14, 2016, former CEO Immelt stated that GE's earnings guidance was "very strong pipeline not just in the Power business but across the portfolio."

82.     In reality, however, GE Power was actually suffering from declining margins on its equipment sales and decreasing customer utilization rates, and the Individual Defendants kept the illusion of meeting earning targets alive by propping up GE Power's earnings with improper accounting practices.

83.     Essentially, the Individual Defendants utilized the long-term nature of the LTSAs to artificially inflate GE Power's contract assets and therefore inflated its revenues and profits.  GE

recognized revenues under the LTSAs before the actual billing of the customers or receipt of any payment. GE categorized such revenues under contract assets along with other assets, concealing the LTSAs' proportion in this classification. GE Power reported rapidly growing contract assets of $9.4 billion in 2012, $12.5 billion in 2013, $16.9 billion in 2014, and $21.156 billion in 2015. These calculations were the result of GE's heavy reliance on positive cumulative catch-up adjustments, whereby the Company estimated increased revenues by adjusting its expected profits from LTSAs upwards. Although objective customer and industry data indicated a decrease, Defendants continued to report positive cumulative catch-up adjustments.

84.    Further, upon announcement of new accounting rules in May 2014, GE Power began factoring (or selling) its LTSA receivables to GE Capital in order to conceal growing cash flow problems. By utilizing this strategy, the Individual Defendants were able to prevent investors from noticing the gap between GE Power's reported revenue and its ICFOA (cash that is actually received for services provided).

85.    Analysts expressed their concerns about the increasing gap between GE Power's contract assets and ICFOA during a January 20, 2017 conference call, in which they were given an opportunity ask their questions regarding the Company's 2016 year-end results. However, GE Capital's role in GE Power's ICFOA was denied by Defendant Bornstein, who specifically said that GE Power was performing very well and that GE Capital's factoring activities were not significant to GE Power's performance. The dialogue went thus:

> **Steven Winoker—Sanford C. Bernstein & Co.—Analyst**
> Thanks, good morning. Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial? And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving.

**Jeff Bornstein—General Electric Company—SVP & CFO**
Okay, there's a lot in that. So let me start with the fourth quarter, Steve. We improved working capital in fourth quarter about $5.2 billion which the best we can tell is the strongest working capital quarter the Company has ever had. And I want to just give you some of the pieces on that.

\* \* \*

So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million.

So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring.

86.     These statements were false and misleading because they failed to disclose the declining utilization of GE-serviced assets under LTSAs, GE Power's reliance on LTSA modifications and cumulative catch-up adjustments, and GE's Power's heavy reliance on factoring to hide its liquidity problems.

### C.  The Exchange Act Defendants Made False and Misleading Statements and Omissions in the Company's 2017 Proxy Statement

87.     On March 8, 2017, GE filed its 2017 Proxy Statement with the SEC (the "2017 Proxy Statement") seeking the reelection of the Company's directors. The 2017 Proxy Statement stated that the Board's role was "overseeing risk management and **understanding the most significant risks facing the company**" and touted that GE had "added directors with experience in risk management and oversight." The 2017 Proxy Statement further represented that "GE uses a broad set of financial metrics to measure its performance, and **accurate financial reporting and robust auditing are critical to our success**."

88.     These statements were false and misleading and omitted material information

because the Board had in fact consciously disregarded its oversight responsibilities with respect to the accuracy of GE's financial reporting and the significant risks posed by the Company's crumbling LTC insurance policies in its GE Capital division and illusory revenue recognition scheme in its GE Power business.

**D.  While Committing the Wrongdoing Alleged Herein, the Waste Defendants and Unjust Enrichment Defendants Approved and/or Received Millions of Dollars from the Company**

89.     From 2014 to 2018, each of the Unjust Enrichment Defendants participated in the breaches of fiduciary duties, violations of securities laws, and other wrongdoing alleged herein.

90.     Each of the Waste Defendants served on the Board during the same period.  Yet despite being aware of and indeed participating in the same wrongdoing, the Waste Defendants approved millions of dollars of compensation to the Unjust Enrichment Defendants in exchange for their purported loyalty and fidelity to the Company.

91.     The Unjust Enrichment Defendants were not entitled to receive such compensation, and no rational person would have approved such compensation, in light of the Unjust Enrichment Defendants' material misrepresentations and fraudulent practices regarding the Company's looming LTC risk exposure and liquidity crisis with GE Power.

**E.  Defendants' Fraud Unraveled and the Truth Began to Emerge**

92.     In mid-2017, the truth – although only partial – began to emerge regarding GE's cash flow issues, mismanagement of LTC reserves, and GE Power's earning issues.

93.     On April 21, 2017, the Company shocked the market when it was reported ICFOA of "negative $1.6 billion."

94.     Three months later, GE announced that GE Capital's LTC reserves and its contract assets had "adverse claims experience in a portion of our long-term care portfolio and we will

assess the adequacy of our premium returns." Upon this partial disclosure, GE's share price fell $0.78, or 2.92%, to close at $25.91 on July 21, 2017, shedding approximately $6.8 billion in market capital.

95.     On October 20, 2017, GE announced its third-quarter 2017 results. During the discussion of these results with analysts, GE revealed that it had "recently observed elevated claims experience for a portion of the long-term care book at GE Capital's legacy insurance business" and the Company "began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claims reserve adequacy test." On the same conference call, GE announced that the Power segment was underperforming. On this news, JP Morgan, Morgan Stanley, and other analysts downgraded GE's stock and the stock price fell another $1.51 per share to close at $22.32 on October 23, 2017, shedding approximately $13.1 billion in market capital.

96.     Then, on November 13, 2017, GE announced that it was cutting its annual dividend in half, from $0.96 to $0.48 per share. This was a significant and shocking announcement, as the Company had not cut its dividend since the Great Depression. Additionally, GE's former CEO Flannery declared that GE Capital would not be paying a dividend to GE in 2018. Flannery explained this decision by stating: "[W]e've been paying a dividend in excess of our free cash flow for a number of years now" and further explained that "dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow in the next couple of years . . . . So, the single biggest delta, I think is obvious, which is what happened in the Power business."

97.     As a result of these statements, along with the significant dividend cut, the Company's stock price fell an additional $1.12 per share, to close at $17.90 on November 14,

2017, shedding approximately $9.7 billion in additional market capital.

98.    Further, as would later be revealed, in November 2017, the SEC began investigating the Company's revenue recognition practices and internal controls over financial reporting relating to LTSAs.

99.    On January 16, 2018, GE announced that it would be exposed to an assessment of "after-tax GAAP charge of $6.2 billion for the fourth quarter of 2018." Additionally, GE revealed that GE Capital would be required to allocate $15 billion for the statutory LTC reserves for seven years and [would] suspend its dividend to GE for the "foreseeable future."

100.    Considering the long history of insurance companies facing substantial losses relating to their LTC policies, analysts covering GE suggested that GE likely had prior knowledge of its LTC reserve problems. For instance, Melius Research analyst Scott Davis reported that it is "very hard to believe that mysteriously overnight GE found problems they didn't know existed." Likewise, Vertical Research Partners analyst Jeff Sprague noted that "[i]t's hard to imagine a $15 billion problem materialized in the course of the year." Further, the inadequacy of LTC cash reserves could not have been a surprise to the Individual Defendants, as the Company had previously owned Genworth, which had systemic problems with its LTC reserves.

101.    Analysts covering GE Power were similarly skeptical about the Individual Defendants' revelations. On February 21, 2018, the Wall Street Journal in an article titled, *How Jefferey Immelt's Success Theater Masked the Rot at GE*,[6] reported that former executives were "pulling future profit forward." The article noted that "[s]ome analysts have expressed concern GE's accounting for the upgrades masked pressure on the [Power] division. According to former

---

[6]    *Available at* https://www.wsj.com/articles/how-jeffrey-immelts-success-theater-masked-the-rot-at-ge-1519231067 (last accessed Jan. 5, 2021).

executives, the upgrades meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that future sales were being pulled forward." This article also quoted Deutsche Bank analyst John Inch, who had a "sell" rating on GE's stock because "[t]he history of GE is to selectively only provide positive information," and "[t]here is a credibility gap between what they say and the reality of what is to come."

102.    On October 1, 2018, GE suddenly replaced its CEO Flannery with Culp. In the press release announcing the Company's leadership change, it was also revealed that GE would take a "$23 billion non-cash charge" in its GE Power segment—essentially wiping out the entire balance of GE Power's goodwill balance.

### F.   The SEC and DOJ Investigations

103.    On October 30, 2018, in the Company's Form 10-Q announcing its quarterly results for the third quarter of 2018, Defendants revealed that in late November 2017, the SEC had notified the Company that it was conducting an investigation of its revenue recognition practices and internal controls over financial reporting relating to LTSAs.

104.    Following the Company's investor update on January 16, 2018 about the increase in future policy benefit reserves for GE Capital's run-off insurance operations, the SEC expanded the scope of its investigation to encompass the reserve increase and the process leading to the reserve increase.  Upon this news, GE's stock price dropped again, by $0.45 to $16.44 on January 24, 2018.

105.    Following the Company's announcement on October 1, 2018 about the expected non-cash goodwill impairment charge related to GE's Power business, the SEC expanded the scope of its investigation to include that charge as well.

106.    With this news of expanded and additional investigations, GE's stock price dropped

once again from $11.31 to a low of $9.98 in a matter of hours.  In sum, since July 20, 2017 (the day before the Company disclosed problems with its LTC reserves) to October 31, 2018 (the day after these new revelations), GE's stock price dropped from $26.69 to $9.98—a devastating loss of nearly 63%.

107.    On October 6, 2020, GE announced that on September 30, 2020, the SEC staff issued a "Wells notice" to GE, advising that it is considering recommending that the SEC bring a civil injunctive action against GE for possible violations of securities laws related to "historical premium deficiency testing for GE Capital's run-off insurance operations, as well as GE's disclosures relating to such run-off insurance operations."

108.    In the Company's 10-Q for the third quarter of 2020, filed with the SEC on October 28, 2020, Defendants disclosed that GE has "recorded a reserve of $100 million as of September 30, 2020 related to the investigation."

109.    Even this extensive reserve would prove woefully inadequate.  On December 9, 2020, the SEC Order was issued, announcing that GE agreed to pay ***$200 million*** to the SEC to settle claims regarding its disclosure failures within GE Power and GE Capital.  According to the SEC Order, the SEC found that, between 2015 and 2017:

> GE failed to disclose to investors information concerning the nature of its reported profit growth in its power business and $2.5 billion in reported cash collections. Second, from the third quarter of 2015 through the first quarter of 2017, ***GE failed to disclose to investors worsening trends in its insurance business and the potential for substantial losses***.  GE's insurance business ultimately incurred a $9.5 billion pre-tax charge against GE's earnings for the fourth quarter of 2017 and required capital contributions by GE of approximately $15 billion over seven years to fund expected future insurance claims.[7]

110.    With respect to the misleading statements regarding the GE Power segment, the

---

[7]    Unless otherwise specified, all emphasis herein is supplied.

SEC found that:

GE failed to disclose that more than one quarter of GE Power's reported profits in 2016 and almost half of its reported profits in the first three quarters of 2017 resulted from reductions in estimates of the cost to complete its multi-year agreements to provide repairs and service for customers' power turbines.  Under GE's accounting method, these reductions in cost estimates resulted in large revenue and earnings increases in the period in which the estimates were changed.  *In public disclosures, GE misled investors by describing its Power segment profits without explaining that more than $1.4 billion in 2016 and $1.1 billion in the first three quarters of 2017 stemmed from reductions in cost estimates*.

GE reported increased industrial cash collections commensurate with increased Power segment profits in 2016 and 2017 by changing its practices to sell (or "factor") longer term receivables from its Power service multi-year agreements, principally to GE's own subsidiary (known as GE Capital).  Selling longer term receivables to GE Capital allowed GE immediately to report increased industrial cash flow, without disclosing that GE was depleting future cash flows by moving them into the present.  As a result of this new practice, called "deferred monetization," GE boosted a publicly reported cash flow measure by more than $1.4 billion in 2016 and more than $500 million in the first three quarters of 2017.  GE failed to disclose to investors its adoption and reliance on deferred monetization which increased present industrial cash flow at the expense of future years.

111.    With respect to the misleading statements regarding GE's insurance business, the

SEC found that:

GE's insurance business reinsured billions of dollars' worth of policies written by other insurers, including a substantial number of long-term care insurance policies.  Long-term care policies cover future costs associated with growing older, such as nursing home and assisted living expenses.  Long-term care policies – including those insured by GE – were badly underpriced.  By 2015 and 2016, claims by long-term care insurance policy-holders had been exceeding GE's original projections for years.  *In 2015 and 2016, despite known continuing trends of increasing costs from long-term care insurance policies, GE's insurance business lowered projected claims costs for the distant future and simultaneously concluded that it did not have insurance losses.*  GE failed to disclose its rising claim costs and the resulting potential for material insurance losses.

In 2017 and 2018, GE made a series of public announcements describing disappointing cash and earnings results in its GE Power business as well as the $9.5 billion pre-tax insurance charge and required capital contributions of approximately $15 billion over seven years. These issues contributed to GE's almost 75% stock decline during those years.

112.     According to the SEC Order, GE lacked proper internal audit controls and "***did not design and maintain sufficient internal accounting*** controls governing: (1) management's process for determining, reporting, and recording its loss recognition testing for its insurance business, and (2) the supporting documentation that must be maintained to evidence management's process in determining its loss recognition testing estimate."   Moreover, according to the Order, "GE ***lacked sufficient disclosure controls and procedures to ensure that known trends and uncertainties regarding its insurance liabilities*** were accumulated and communicated to the GE executives responsible for the company's disclosure in a timely manner as required by Rule 13a-15(a)."

113.     According to the Company's 10-K for the fiscal year ended December 31, 2019, filed on February 24, 2020, the DOJ is also investigating these matters.

### G.  The Full Impact of Mismanagement at GE Power and GE Capital Became Clear

114.     On December 14, 2018, the Wall Street Journal published an article titled "*GE Powered the American Century – Then It Burned Out*" (the "Dec. 14, 2018 WSJ Article"),[8] detailing alleged wrongdoing at GE Capital and GE Power, in addition to asserting that the Company's culture fostered a lack of oversight by the Board Members.[9]

115.     According to the article:

[GE Capital's] cash flowed up to headquarters where it powered the development of new jet engines and dividends for shareholders.  Capital also gave General Electric's chief executives a handy, deep bucket of financial spackle with which to smooth over the cracks in quarterly earnings reports and keep Wall Street happy. Sometimes that meant peddling half a parking lot on the final day of a quarter, or

---

[8]     *Available   at*   https://www.wsj.com/articles/ge-powered-the-american-centurythen-it-burned-out-11544796010  (last accessed Dec. 5, 2020).

[9]     The article was based on "scores of interviews with dozens of people directly involved" in the events described therein, including "current and former board members, senior executives and employees at GE headquarters and its various business units," as well as, among other things, a review of "internal GE communications and documents, including emails, slide presentations and videos."

selling a part interest in a power plant only to purchase it back after the quarter closed.

116.    The Dec. 14, 2018 WSJ Article also confirmed that GE is heavily dependent on GE Capital financially.  Pursuant to the article "a handful of top-ranking executives huddled here and there, always discreetly, to discuss their most obvious problem.  GE couldn't live without GE Capital, still so big it was essentially the nation's seventh largest bank.  But investors couldn't live with GE Capital and its unshakable shadow of risk, either."  Indeed, GE Capital's "ghost of an insurance business that investors thought the company had rid itself of years before would prevent GE Capital from sending the $3 billion it had promised to headquarters."

117.    GE Capital's internally-known risk exposure due to LTC policies was also discussed in the article. In particular, the article posited that: "The bankers didn't think the long-term-care business could be part of the Genworth spinoff.  To make the deal more attractive, GE agreed to cover any losses.  This insurance for insurers covered about 300,000 policies by early 2018, about 4% of all such policies written in the country.  Incoming premiums weren't covering payouts."

118.    Similarly, according to the article, GE Power became "stretched" after GE Power closed a deal with Alstom SA ("Alstom") in 2015[10] and in order to hit the targets GE resorted aggressive accounting in their long-term service contracts.  In pertinent part, the article states that:

> *Throughout 2016, teams inside Power combed through the portfolio of service contracts*, each representing payments from power generators to maintain the turbines GE had sold them.  *By design, those contracts were malleable*.  A technological innovation that improved the performance of a turbine blade or lengthened the number of hours between maintenance outages had to be accounted for.
>
> The GE teams started offering discounted turbine upgrades to customers in

---

[10]    In November 2015, GE acquired Alstom's power and grid businesses – its largest-ever industrial purchase.

exchange for extending the length of contracts to as far out as 2050. ***Executives scoured existing contracts for ways to change underlying assumptions, such as the frequency of overhauls, to boost their profitability.***

GE Power even sold its receivables-the bills its customers owed over time-to GE Capital to generate short-term cash flow. ***The unit gave customers discounts*** on their service contracts, lowering their overall value, ***in exchange for renegotiations that let the company bill the customers sooner.***

***The accounting maneuvers were legal, if aggressive, GE executives assured one another***. But it also meant that the ***profits were mostly on paper***. Rarely was a new dollar of profit flowing in the door.

Bolze's team was operating in a tradition that stretched at least as far back as the glory days of Jack Welch, but the ***scale of the aggressive contract accounting was far bigger.***

Worry was starting to grow inside Power by the end of 2016. Management's expectations about the sales growth and profit they should be able to hit didn't reflect the dim reality of the market, team members told Bolze and Paul McElhinney, the head of the unit that administered the service contracts.

***The complaints were common among lower-level executives, but when raised to leaders like McElhinney, they were stopped cold***.

Steve's our guy," McElhinney said in one meeting. If Bolze was elevated to CEO, those behind him in Power would rise too. "Get on board," he said. "***We have to make the numbers***."

119.    Moreover, the December 14, 2018 WSJ Article sheds a light on the Company's culture that fostered a lack of oversight by the Board Members. In particular, the article states that, "[f]or 36 years under Immelt and Welch, the board had largely followed the chairman's lead. One newcomer under Welch was so surprised by the lack of debate that the director asked a more senior colleague, 'What is the role of a GE board member?' 'Applause,' the older director answered."

120.    As stated in the article, the severity of the lack of oversight was evident; for example, when a 24-year GE director and the former CEO of JP Morgan, Defendant Warner, disagreed with Immelt concerning his successor as a CEO, he was pushed out by Immelt.

121.    On January 31, 2019, GE announced its dismal results for the quarter ended December 31, 2018.  According to the January 31st press release, GE Capital's "[c]ontinuing operations incurred a loss of $86 million in the quarter" and after completing its "loss recognition testing on our insurance business during the quarter and recorded a $65 million charge after-tax." In the same press release, GE reported that GE Power "was negatively impacted by continued execution and operational issues on equipment projects and transactional services. Revenues of $6.8 billion were down 25% and the business incurred a loss of $872 million primarily related to these issues."  Further, GE Power's "profit was negatively impacted by price, liquidated damages for execution delays on projects, and higher losses related to the legacy Alstom joint ventures as we began fully consolidating these entities during the quarter."

122.    That same day, during GE's earnings call for the fourth quarter of 2018, Culp listed his priorities, one of which was "high-level financial results."  However, Culp stated that for the fourth quarter, GE's industrial free cash flow was $4.9 billion, which "was negatively impacted by the weakness in Power" segment.  Additionally, Culp stated that GE ended the year "GAAP EPS of negative $2.43 and industrial free cash flow of $4.5 billion" and GE's backlog "stands at $391 billion, up 5% year-on-year with equipment at $89 billion, up 4%; and service at $302 billion, up 5%."  During the same call, Culp explained the root causes of GE Power's poor performance, which included goodwill impairment, originated from the Alstom acquisition and poor execution. Specifically, Culp stated that "Power faces a number of nonoperational headwinds, and we expect a high-water mark in this regard this year.  These include legal settlements and legacy project erosion, principally driven by the Alstom acquisition."  Further, Culp emphasized that in order to fix GE Power:

> [W]e need to execute better. Running Power better means improved daily
> management in how we sell, make and service our products.  Let me give you a few

examples.  We had separate teams of managers commissioning new plants, owning the warranty period and overseeing the services contracts after the warranty.  Now we present one face to the customer, who is accountable for the best long-term economic answer, both for the customer and GE.  We put the sales organization under one leader with deep domain expertise and we are coordinating better on contract negotiations.  We now have more experienced people owning negotiations and responsible for project cost.  We performed risk assessments of our existing 400 equipment contracts to identify cost and execution risks.  We also performed a similar assessment on the 750 CSA contracts to identify price and utilization risk.  We have overhauled our commercial underwriting processes to set more realistic commitments and returns from the start.

123.    During this call, Charles Stephen Tusa of JP Morgan Chase & Co ("Tusa") asked Culp whether GE, including GE Capital, would generate cash in 2019.  Culp responded that they are "going to see pressures, both operational and nonrecurring" along with "nonrecurring events or issues."  According to Culp, GE "got better line of sight today on some of these legacy issues that come out of Alstom that [GE is] on the hook for."  Culp stated that "I think the headline is we finished strongly.  We know we got some operating and nonoperating pressures and think we work through that in '19 with an eye toward a stronger cash flow performance in '20 and '21."

124.    Further, Andrew Alec Kaplowitz of Citigroup Inc. asked Culp regarding GE Capital's relatively small LTC adjustment, "do you feel reasonably confident that you've identified all the skeletons in the closet, and the level of negative surprises are really going to start dropping moving forward?"  Culp responded to this question by stating "I don't think I would ever say, even on my last day here, that we have found all the skeletons."

125.    Also during this call, Senior VP and CFO Miller announced that GE had booked an incremental $69 million charge for GE Power in addition to the $22 billion impairment charge.  Further, Miller announced that "Alstom and GE exercised their JV redemption rights and call options, which we settled for $3.1 billion in the fourth quarter.  These entities operate at a loss.  So the consolidation of 100% of the financials negatively impacted fourth quarter and will be an

income headwind for us of about $300 million in 2019."  While discussing profits, Miller stated that GE Power "lost $872 million in the fourth quarter."  Further, Miller revealed that GE Power had incurred $350 million of costs related to Gas Power System projects, and had recorded $400 million of charges due to stage 1 blade issues with its High Efficiency, Air Cooled turbines ("H-Class turbine") – which was "something that [they] had expected would happen."[11]  According to Miller "[t]hese items had a significant impact on Power's results."

126.   Further during this call, after analyst Andrew Burris Obin of BofA Merrill Lynch requested further details regarding the $400 million charge, Miller responded that GE Power's contracts are "high-margin, long term contracts.  And when we do go through a renegotiation process on some of these, we are often able to offset that price with scope expansion and cost productivity."

127.   Also during the January 31st conference call, Miller stated that GE's "credit rating was downgraded from A to BBB+" and GE Capital "began the quarter with $70 billion of debt and ended with $66 billion."  Miller stated GE would pay down this debt over two years with cash from asset sales with GE Capital's $25 billion asset reduction plan.

128.   On February 26, 2019, GE filed its Annual Report on Form 10-K for the year ending December 31, 2018 (the "2018 10-K") with the SEC and made similar disclosures.  Pursuant to the 2018 10-K, GE's "[c]onsolidated continuing earnings decreased $12.5 billion, due to increased goodwill impairment charges of $21.0 billion, increased non-operating benefit costs of $0.4 billion

---

[11]   Miller's statements contradicted GE's prior public statements concerning the blade defects. On December 27, 2017, it became public that GE's turbines had run into problems in Pakistan and caused delays and lengthy outages.  However, on January 24, 2018, during GE's conference call regarding its fourth quarter 2017 and full year results, GE Power's CEO Russell Strokes downplayed the defect in the H-Class turbines and represented that GE was "proud of HA gas turbine technology" as "[i]t is operating in line with performance guarantees," and issues at certain sights were "readily addressed."

and decreased GE Industrial continuing earnings of $0.2 billion, partially offset by decreased Financial Services losses of $6.3 billion and decreased provision for GE Industrial income taxes of $2.7 billion."   Additionally, the 2018 10-K highlighted that "[f]inancial Services continuing losses decreased $6.3 billion, or 93%, primarily due to the nonrecurrence of the 2017 charges associated with the GE Capital insurance premium deficiency review and EFS strategic actions, partially offset by the nonrecurrence of 2017 tax benefits."

129.    Further, the 2018 10-K disclosed that "[i]n the fourth quarter of 2018, GE completed the funding of $3.1 billion for Alstom redemption rights related to certain consolidated joint ventures."  As stated in the Form 10-K following the Alstom acquisition in 2015, GE was "subject to legacy legal proceedings and legal compliance risks that relate to claimed anti-competitive conduct or improper payments by Alstom in the pre-acquisition period, and payments for settlements, judgments, penalties or other liabilities in connection with those matters will result in cash outflows."

130.    In addition, when GE acquired Alsto's power business for $10.6 billion, its book value was negative $7.2 billion.  GE represented the $17.8 billion disparity between Alstom's book value and GE's purchase price to the market as "estimated GE-specific synergies."[12]  However, according to the December 14, 2018 WSJ Article, the Alstom acquisition was known or should have been known to result in significant good will charges.  Specifically, the article posited:

> Alstom was in greater need of cash than the market understood, had too many employees and French law made it too difficult to lay off workers and sell assets.
>
> ***
>
> A band of skeptics inside GE Power were hopeful the deal would collapse.  When advisers determined that the concessions to get the deal approved might have grown

---

[12]    Pursuant to the Company's Form 10-Q filed with the SEC for the quarterly period ended September 30, 2016.

costly enough to trigger a provision allowing GE to back out, some in the Power business quietly celebrated, confiding in one another that they assumed management would abandon the deal.

But Immelt and his circle of closest advisers wanted it done.  That included Steve Bolze, the man who ran it and hoped someday to run all of General Electric.

131.    Further, GE's 2018 10-K also disclosed:

Based on the results of our annual impairment test, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment.  The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition, at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units.  As previously disclosed, the power market as well as its operating environment continues to be challenging.  Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets.  In addition, our near-term earnings outlook has been negatively impacted by project execution and our own underlying operational challenges.

132.    The 2018 10-K also revealed the details of the blade issues with the H-Class turbines as:

During the third quarter of 2018, Gas Power Systems recorded a $0.2 billion pretax charge related to an oxidation issue within the HA and 9FB Stage 1 turbine blades, resulting in increased warranty and maintenance reserves.  In addition, Power recognized pre-tax charges of approximately $0.4 billion associated with an increase in issues on our existing projects driven by execution as well as partner and customer challenges.

133.    Further, pursuant to the 2018 10-K, during the fourth quarter of 2018, GE Power:

[R]ecorded pre-tax charges of $0.8 billion, of which $0.4 billion was related to various assumption updates for unfavorable pricing, lower utilization, and cost updates on our long-term service agreements and $0.4 billion related to execution issues resulting in liquidated damages and partner execution issues on our longterm equipment projects at Gas Power Systems.

134.    The 2018 10-K reports GE Power's backlog as $91.9 billion, with revenues down $7.6 billion (22%) and profit down $2.8 billion.  Additionally, the 10-K stated that "[d]uring the

fourth quarter of 2018, we finalized step two of the impairment analysis, and increased the impairment charge by $69 million resulting in a final impairment charge of $22,042 million." As to the GE Capital segment LTC reserve deficiency, to cure the deficiency GE announced in the 2018 10-K that:

> During the fourth quarter of 2018, we completed our annual premium deficiency test. This review included updated experience studies based on additional data since the 2017 test, and considered updated external input based on industry trends and adjustments to assumptions as a result. Based on this analysis, using our most recent future policy benefit reserve assumptions, we identified a premium deficiency which resulted in a $82 million pre-tax charge to earnings in 2018.

135.    On March 5, 2019, during GE's JPMorgan Aviation, Transportation & Industrials Conference, Culp acknowledged that issues arising from GE Capital and GE Power segments were affecting consolidated results and the Company's overall performance. Specifically, Culp stated that:

> We saw a lot of growth in Renewables on the back of the PTC cycle. But that didn't all fall through in the way we would have liked, more so because of the challenges we had in our Power business and, clearly, at capital, as we continue to make capital smaller and simpler. We have a number of issues to work through there, not the least of which is the insurance funding on the back of our long-term care run-off obligations.

136.    During the March 5th conference, Tusa asked Culp about the H-Class turbine blade defect and inquired "What is the specific fix that's going on? And why are you so confident of the Hframe, that the H-frame is not an issue going forward?" Culp responded to this issue by stating that:

> Our H-frame gas turbine is our new leading-edge technology that was recently introduced. We have, I think, is it 30 -- I think we've got 33 units in the field currently. So it's relatively new. We had an oxidation issue on one of the blades that created cracking after a certain amount of use. We thought we might have an issue over an extended life. It turned out we had the issue, we just didn't realize it would happen—it would go into failure mode as early as it did. I think as we've gone through the field upgrades—we've upgraded, I think, 23 of the 33. We've got about 10 to go. We're encouraged by what we're seeing. We're bringing back the blades that have been replaced. And again, those are the blades that are replaced,

not the ones that have broken, to do further root cause analysis on the coating.  We feel pretty good about what we're seeing in the laboratory.  We've got 2,000 blades that have come in.  But this will be continue to be a source of review and analysis. I think I probably take the most comfort, though, Steve, to your last question, from what I hear from our customers, right?  Chris Crane, for example, the CEO of Exelon. Chris had 2 units go down on him.  When I talked to Chris, Chris said, "I'm a proud owner of serial #1 and serial #2 of the H-frame.  We knew that with leading-edge technology, this sometimes happens.  You were upfront with us then that this could happen.  You've been good to us in helping us understand what happened and how we fix it.  So Steve, to me, this is all part of innovating and bringing new technology to work.  So it'll be a while before we can say that issue is resolved once and for all.  But I think we're trying to be as, again, we're trying to embrace our reality.  Wish it didn't happen, fixing it, tending to the customers as best we can.

137.    During the same conference, Culp projected that the downward trend in GE Power would continue in 2019 as well, by stating "we mentioned this on the fourth quarter earnings release, that lost a lot of money last year, to the tune of $2.7 billion.  We're going to continue to see negative - - I should say, in terms of negative free cash, we're going to see that continue in 2019."  Moreover, Culp stated that "we think we'll see even a greater level of negative free cash in Power in this year as we work through these issues."  Further, in order to stress the gravity of the issues in GE Power, he stated "this is a multiyear turnaround in Power.  I don't want to sugarcoat that in any way, shape or form.  There's a lot of work.  It's a game of inches."

138.    During the same conference, Tusa inquired whether "the GE Capital contribution of $4 billion in 2019 [was] one and done?"  Culp stated that GE Capital's contribution of "$4 billion captures that parent support" and "we'll see parent support depending on how things play out at Capital as we shrink that balance sheet …. So it's a hard number to forecast or give guidance on. But is that the last dollar, that 4—fourth—or 4 billionth dollar this year, the last dollar parent support going that way? No."  Culp also disclosed that GE's industrial free cash flow would be negative in 2019, upon a discussion of the headwinds from GE Capital and GE Power.

139.    After the March 5, 2019 conference, GE shares closed down 4.7%, at $9.89.

140.    On March 7, 2019, during GE's Insurance Teach-in Conference Call, GE's

Managing Director Bob Deutsch acknowledged that the $82 million charge to GE Capital's LTC

insurance business was relatively small and he stated that GE would continue to project an

incremental $9 billion of capital investment to be funded through 2024.  He stated:

> We are also going to discuss the rigorous process and assumptions that we have
> built into our recently completed GAAP loss recognition testing, or LRT; and
> annual statutory cash flow testing, or CFT.  As discussed on the fourth quarter
> earnings call, the LRT resulted in an $82 million pretax charge.  While this net
> charge was relatively small, the LRT was driven by large changes in both the
> morbidity improvement and discount rate assumptions.  The statutory testing
> results were the key driver of the $1.9 billion capital contribution made on February
> 19, which was in line with previous guidance.  We continue to project an
> incremental $9 billion of capital investment to be funded through 2024.  We believe
> our stated reserves are appropriate today, based on our review of the risk in our
> portfolio and the expected future experience.  As the business continues to evolve,
> we will reassess our reserves.

141.    Analysts were skeptical about GE's loss recognition testing considering the $10

billion difference between GE's statutory and GAAP reserves.  In particular, Ryan Joel Krueger

of Keefe, Bruyette, & Woods, Inc. asked Deutsch:

> You show—we can derive some of the differences looking at some of the
> sensitivities you provided.  Looks like maybe there's a couple of billion difference
> from morbidity improvement assumptions and several billion probably from the
> discount rate.  But I was hoping you can maybe go through a little bit more of what
> is making up that $10 billion difference because that's quite a bit of a larger
> difference than seems to exist within the rest of the industry."

142.    Deutsch agreed that the statutory and GAAP reserves were significantly different

but he refused to give details as to GE's calculation as to this point and basically stated that there

was "a meaningfully large difference."  Deutsch also stated:

> The GAAP assumptions start with a certain set of baseline assumptions.  The
> statutory assumptions are more conservative.  In most cases, it's that present value
> that ends up being that level of difference.  Bear in mind the statutory numbers that
> we show include an adjustment for the $9 billion of additional actuarial reserves
> that we anticipate funding over the next 5 years.

143.    On March 14, 2019, during GE's Outlook Conference Call, Culp repeated the root causes for the delay in GE Power's turnaround.  Culp stated "there are number of nonoperational headwinds or what we call inheritance taxes that we need to pay off, legacy obligations, some of which are rooted in the Alstom acquisition and Power, it has been undermanaged over the last couple of years."  Culp's projection for 2019 concerning GE Power's revenue was that it would "be down high single digits versus last year."  Further, Culp stated that "[f]ree cash flow will be down from a negative $2.7 billion in 2018 due to progress collections headwinds, increased project costs and restructuring, which we will cover in more detail soon.  While this is a multiyear journey, 2019 is a critical step."  Additionally, Culp stated that he expected continued pressure in 2019 and 2020.

144.    On July 31, 2019, GE suddenly announced that Miller would be stepping down as CFO, but would remain in the position until the Company could find a replacement.

### H.  The Bombshell Markopolos Report

145.    Miller's sudden resignation as GE's CFO was followed by serious accusations of accounting fraud within the Company.  On August 15, 2019, Harry Markopolos—a former securities industry executive and a forensic accounting and financial fraud investigator—released a report (the "Markopolos Report")[13] alleging that GE's accounting fraud was "bigger than Enron and WorldCom combined.  In fact, GE's $38 Billion in accounting fraud amounts to over 40% of GE's market capitalization, making it far more serious than either the Enron or WorldCom accounting frauds."

146.    According to the Markopolos Report, Markolopos's team "went out and located the

---

[13]    Harry Markopolos, *General Electric, A Bigger Fraud than Enron* (Aug. 15, 2019), *available at*  https://fm.cnbc.com/applications/cnbc.com/resources/editorialfiles/2019/8/15/2019 _08_15_GE_Whistleblower_Report.pdf (last accessed Dec. 6, 2020).

8 largest [LTC] insurance deals that GE is a counterparty to, accounting for approximately 95% or more of GE's exposure.   Either these 8 insurance companies filed false statutory financial statements with their regulators or GE's financial statements are false." *Id.* Further his team "paid to use the National Association of Insurance Commissioners (NAIC) and AM Best Databases to access these 8 insurers' statutory financial statements filed with the relevant state insurance commissions" and they revealed "GE was hiding massive loss ratios, the highest ever seen in the LTC insurance industry, along with exponentially increasing dollar losses being absorbed by GE."

147.     The Markopolos Report explained that management's positive cash flow in 2021 promise was not feasible because:

> The GE Capital insurance unit with the largest losses is ERAC and that unit's average policy-holders' age is now 75.   The losses in this unit led to GE's unexpected late 2017/early 2018 $15 Billion reserve hit.   Unfortunately, the fast approaching 5-year age group between 76-80 will see a 77% increase in LTC claims filed which will see GE's losses increase several-fold.   We expect to soon see loss ratios of 750% to 1,000% or more on some of GE's reinsurance agreements. According to industry data, approximately 86% of GE's LTC claims are ahead of them and the accompanying losses are growing at an exponential and un-survivable rate.

> Of the $29 Billion in new LTC reserves that GE needs, $18.5 Billion requires cash immediately while the remaining $10.5 Billion is a non-cash GAAP charge which accounting rules require to be taken no later than 1QTR 2021.   These impending losses will destroy GE's balance sheet, debt ratios and likely also violate debt covenants.   Unfortunately, GE has almost no cash, so they had to request special forbearance from the Kansas Insurance Department (KID) to be able to fund their January 2018 $15 Billion reserve increase over a 7-year time horizon, so the odds of them being able to fund $18.5 Billion in new cash reserves is doubtful.

148.     Furthermore, the Markopolos Report asserted that GE Capital's reserves were known, or should have known, to be insufficient as early as 2012, yet management continued to underfund GE Capital reserves and made dealings with the Kansas Insurance Department in order to postpone the consequences of its ill-funded insurance reserves.   In specific part, the Report stated that:

GE should have taken a reserve hit as early as 2012, and certainly no later than 2015, but they waited until new management came in and booked what little reserve they could afford in late 2017/early 2018, a $15 Billion commitment that they had to request a special exemption from the Kansas Insurance Department (KID) to spread over a 7-year period because, plainly put, GE isn't liquid right now and likely won't survive long enough to make their last few years of reserve payments anyway.

149.    More disturbingly, the Markopolos Report stated that a former GE Capital employee "left after growing concern that senior executives in the division were changing numbers and their methodology without providing supporting evidence."   The Report alleged that, in addition to the LTC claims that had already surfaced, GE was still "hiding $29 Billion in additional LTC losses from investors."

150.    The Markopolos Report additionally revealed that "GE's cash situation is far worse than disclosed in their 2018 10-K, in fact once GE's $9.1 Billion accounting fraud tied to its Baker-Hughes GE (BHGE) acquisition is accounted for, GE only had $495 Million in cash flow from operating activities in 2018 and it ended the year with MINUS $20 Billion in working capital." Put in another way, the Report alleges that "GE improperly Consolidated BGHE in its financial statements to hide" its "$20 billion working capital deficit."

151.    The Report also explained that while the Company's stock price was inflated, during 2012-2018 "GE spent 3.5 times more on share buybacks that it earned."

152.    After the Markopolos Report was published, GE's stock plunged, falling by 11%.

153.    Significant media coverage and negative analyst comments followed.  For example, a Bloomberg article quoted Scott Davis, an analyst at Melius Research, who said that the Markopolos Report "accurately depicts a GE culture that historically hid losses and deceived investors."[14]

---

[14]    Katherine Chiglinsky, Rick Clough, and Jack Pitcher, *GE Plunges Most in 11 Years as*

## I. **Lawsuits Against the Defendants Ensued**

154.    Based on these fraudulent activities, numerous class actions and other lawsuits have been filed against Defendants.

155.    In 2017, class action lawsuits were filed in the United States District Court for the Southern District of New York (previously defined as the "Securities Class Action") against the Company and certain of the Individual Defendants, namely Immelt, Bornstein, Miller, Sherin, Hauser, and Laxer (collectively with the Company, the "Securities Class Action Defendants").[15] The Securities Class Action alleges that for nearly four years—between February 27, 2013 and January 23, 2018, inclusive—the Securities Action Defendants engaged in a fraudulent scheme and course of conduct designed to hide the truth about the Company's financial health and growth prospects in violation of federal securities law.

156.    On October 19, 2018, a class action was filed in New York Supreme Court (New York County) against the Company, GE Capital International Holdings Limited, GE Capital International Funding Company Unlimited Company, Immelt, Bornstein, Sherin, Laxer, Glavin, and Green, alleging that on June 20, 2016, in connection with the sale of certain senior notes, the defendants disseminated false and/or misleading statements in GE's registration documents in

---

*Madoff Accuser Slams Accounting* (Aug. 15, 2019), *available at* https://www.bloomberg.com/news/articles/2019-08-15/ge-drops-as-madoff-whistle-blower-levels-accounting-accusations (last accessed Dec. 6, 2020) (analyst quoted as stating that the report "accurately depicts a GE culture that historically hid losses and deceived investors"); *see also* Jonnelle Marte, *General Electric shares plunge after report alleges it's a 'bigger fraud than Enron'* (Aug. 15, 2019), available at https://www.washingtonpost.com/business/2019/08/15/general-electric-shares-fall-after-new-report-alleges-bigger-fraud-than-enron/?noredirect=on (last accessed Dec. 6, 2020).

[15]    Four lawsuits were consolidated into the Securities Class Action: *AP-Fonden v. Gen. Elec. Co.*, 1:17-cv-08457-JMF (S.D.N.Y.); *Tampa Maritime Ass'n-Int'l Longshoremen's Ass'n Pension Plan v. Gen. Elec. Co.*, 1:17-cv-09888-JMF (S.D.N.Y.); *Mirani v. Gen. Elec. Co.*, 1:17-cv-08473-JMF (S.D.N.Y.); and *Cleveland Bakers & Teamsters Pension Fund v. Gen. Elec. Co*., 1:18-cv-01404-JMF (S.D.N.Y.).

violation of Sections 11, 12(a)2, and 15 of the Securities Act.[16]

157.   On February 1, 2019 and February 8, 2019, additional class actions were filed in the United States District Court for the Southern District of New York against the Company and various Company executives, alleging false and misleading statements about GE Power in violation of Sections 10(b) and 20(a) of the Securities Act.[17]

158.   On February 27, 2019, another lawsuit was filed in federal court after several shareholders opted-out from the Securities Class Action, bringing their individual claims against the Company, Immelt, Bornstein, Miller, and Sherin, alleging that defendants disseminated materially misleading false statements and omissions concerning GE's overall business prospects, including GE's insurance liabilities and contractual obligations, GE's LTC liabilities and insurance reserves and exposure, GE Power's contract assets and reported revenue, and GE's Alstom acquisition, constituting common law fraud and violating Sections 10(b), 20(a) and Rule 10b-5 of the Securities Act and Section 1707.43 of the Ohio Securities Act.[18]

159.   On August 29, 2019, the Securities Class Action court denied the defendants' motion to dismiss as to "(1) Plaintiffs' Section 10(b) and Rule 10b-5 claims concerning (a) factoring in GE's 2016 Form 10-K and (b) GE's failure to disclose factoring in its Relevant Period

---

[16]   *Houston Mun. Employees Pension Sys. v. Gen. Elec. Co., et al.*, Index No. 655229/2018 (N.Y. Sup. Ct.) (the "New York State Class Action").

[17]   The class actions include *Birnbaum v. Gen. Elec. Co., et al.*, Case No. 1:19-cv-01013 (S.D.N.Y.) and *Sheet Metal Workers Local 17 Trust Funds v. Gen. Elec. Co., et al.*, Case No. 1:19-cv-01244 (S.D.N.Y.).  On April 25, 2019, these two actions were consolidated and styled *In re Gen. Elec. Sec. Litig.*, Case No. 1:19-cv-1013 (DLC) (S.D.N.Y.) (the "2019 Securities Class Action").  The 2019 Securities Class Action was dismissed on May 7, 2020. An appeal of that dismissal is currently pending in the Second Circuit, *sub nom. Birnbaum v. Gen. Elec. Co.* (No. 20-1741).

[18]   *Touchstone Strategic Trust, et al., v. Gen. Elec. Co., et al.*, Case No. 1:19-cv-1876 (S.D.N.Y.) (the "Touchstone Action").  This action has been stayed pending developments in the Securities Class Action.

financial statements, which survive against GE and Bornstein; and (2) for now, Plaintiffs' Section 20(a) claims against each Individual Defendant." *AP-Fonden v. GE*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019).

160.    In rejecting the Securities Class Action Defendants' arguments and denying their motion to dismiss as to these claims, the court found that plaintiffs "hit the mark" by alleging that "GE failed to disclose that GE Power generated [cash] by 'monetizing' receivables through extensive factoring of LTSAs." *AP-Fonden*, 417 F. Supp. 3d at 408-09.   Particularly, the court pointed out that the Securities Class Action Complaint "details, through allegations by former employees with firsthand knowledge among other things, that GE was factoring 'everything' in its Power and Renewable Divisions, including as many LTSAs as it could." *Id.*

161.    Further, the court emphasized GE's management involvement and knowledge by pointing out "[f]actoring was a 'global ... effort' directed by GE Power management in conjunction with GE Capital (which bought some of the receivable streams from the LTSAs), and which was reported in 'weekly, monthly, and quarterly reports' that were integrated into presentations for GE Power's global leadership," and "Bornstein, then GE's CFO, acknowledged in a June 2017 meeting that GE was 'in too deep' to stop factoring; at other times Bornstein discussed factoring in detail during earnings calls." *AP-Fonden*, 417 F. Supp. 3d at 409.

162.    When considering the allegations that "the existing number of LTSAs available to monetize was finite," and "due to slackening demand for new turbines (and thus new LTSAs), GE would not be able to continue factoring receivables indefinitely," the Securities Class Action court concluded that these "allegations, taken together, are more than sufficient to show that factoring was a trend or event that was 'reasonably likely to result' in a change in GE's liquidity or that GE 'reasonably expect[ed]' to have 'a material ... impact on net sales or revenues or income from

continuing operations.'" *AP-Fonden*, 417 F. Supp. 3d at 409.  The Securities Class Action court explained that, because "factoring trades away future revenue for immediate cash, it stands to reason that GE's comprehensive factoring of LTSA receivables would have a material impact on future revenue." *Id.* Accordingly, the Securities Class Action court found a "strong inference" that "GE and at least some of the Individual Defendants were at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures ... would mislead investors about material facts." *Id.*

163.    More disturbingly, the court pointed out that the Securities Class Action Complaint "shows also that Bornstein (who signed GE's financial statements) both knew of the practice and acknowledged that GE was in 'deep' with regard to factoring" and it "plausibly allege that Bornstein and GE (through Bornstein and other executives whose knowledge or intent may be imputed to it … knew facts … suggesting that GE's financial disclosures would be misleading without disclosure of its widespread use of factoring … amounting to at least a reckless disregard of a known or obvious duty to disclose." *AP-Fonden*, 417 F. Supp. 3d at 409.

164.    Additionally, with respect to the other public statements about factoring, the Securities Class Action court found that plaintiffs "adequately pled that the statements were misleading and were made with the requisite state of mind." *AP-Fonden*, 417 F. Supp. 3d at 410. Similarly, the court found plaintiffs' allegations that "management at GE Power and GE Capital directed the efforts to factor LTSA receivables to increase short-term liquidity and that senior members of GE's management, including Bornstein … were aware of the practice before and around the same time as the Form 10-K was issued" was meritorious because "Bornstein is alleged to have 'acknowledged GE's reliance' on factoring and commented that GE was 'in ... deep' with respect to factoring in a meeting just a few months after the 2016 Form 10-K was issued." *Id.* at

413-14.  Accordingly, the Securities Class Action court concluded that "GE 'knew facts or had access to information' showing that its 2016 Form 10-K was misleading in this respect." *Id.* at 414.

165.    The Securities Class Action court granted plaintiffs leave to amend to "allege additional facts regarding the Individual Defendants' knowledge, or conscious disregard of, GE's actuarial issues (with respect to its LTC portfolio) and the trends and risks it should have disclosed (with respect to its LTSAs) that would permit Plaintiffs to clear the scienter bar." *AP-Fonden*, 417 F. Supp. 3d at 415.  On October 25, 2019, Plaintiffs filed a Fifth Amended Consolidated Complaint.  A motion to dismiss that complaint is currently pending.

### J.  The Litigation Demand and the Board's Wrongful Refusal Thereof

166.    On November 14, 2018, pursuant to New York Business Corporation Law § 626(c), Plaintiffs, through their counsel, Melinda A. Nicholson, made the Litigation Demand on the Board to, *inter alia*, conduct "a completely independent internal investigation into," and pursue through litigation, the claims asserted in this action, "take appropriate disciplinary action . . . of the persons responsible for perpetration of the wrongdoing," and "undertake a comprehensive review and overhaul of the Company's corporate governance an compliance practices and systems of internal controls and reporting."  Plaintiffs also demanded that the Company immediately enter into a tolling agreement with each of the Individual Defendants, in order to allow the Board sufficient time to accomplish these tasks.  A copy of the Litigation Demand is attached hereto as Exhibit 2.

167.    On November 30, 2018, counsel for the Company, Greg A. Danilow of Cravath, Swain & Moore, responded that he was able to confirm Plaintiffs' ownership of GE shares (as of record), and that the Litigation Demand would be presented to the Board at its next regularly scheduled meeting (on November 30, 2018).[19]  Mr. Danilow notably did not respond to Plaintiffs'

---

[19]    Mr. Danilow also asked Ms. Nicholson to confirm that Ms. Burden – with whom Mr.

request for tolling agreements, nor did he confirm that the Board had undertaken an independent investigation into the Litigation Demand. A copy of Mr. Danilow's November 30, 2018 letter is attached hereto as Exhibit 3.

168.    Accordingly, on December 6, 2018, Ms. Nicholson responded to the November 30 letter, asking that counsel promptly confirm that the Company had commenced an independent internal investigation into the matters set forth in the Litigation Demand and that it had received executed tolling agreements from the Individual Defendants. A copy of Ms. Nicholson's December 6, 2018 letter is attached hereto as Exhibit 4.

169.    Despite the fact that Mr. Danilow had already confirmed Plaintiffs' ownership of record of GE shares, on December 20, 2018, counsel for the Special Committee, Rachel G. Skaistis, also with Cravath, Swain & Moore, requested proof of Plaintiffs' ownership of GE shares and invited Plaintiffs to provide the Board with any additional information not contained in the Litigation Demand concerning any breach of fiduciary duty or improper conduct by the Individual Defendants. A copy of Ms. Skaistis' December 20, 2018 letter is attached hereto as Exhibit 5.

170.    As requested, on January 10, 2019, Ms. Nicholson provided copies to Ms. Skaistis of Plaintiffs' trade records – showing both ownership of record and beneficial ownership – on January 10, 2019. Ms. Nicholson counsel also provided further information pertinent to the Litigation Demand, including the December 14, 2018 Wall Street Journal article detailing alleged wrongdoing in the Company's GE Capital and GE Power segments, as well as details evidencing the Company's culture that fostered a lack of oversight by the Board Members. Ms. Nicholson also requested information about the composition of the Special Committee and again requested

---

Burden owned GE stock of record in joint tenancy – joined in the Demand. Ms. Nicholson confirmed that in her December 6, 2018 response.

confirmation that GE had received executed tolling agreements from the Individual Defendants. A copy of Ms. Nicholson's January 10, 2019 letter is attached hereto as Exhibit 6.

171.    On April 18, 2019, having not received a response to the January 10 letter, Ms. Nicholson sent another letter to Ms. Skaistis following up the requests made with January 10th letter and updating the Board and the Special Committee concerning recently revealed events and circumstances, including additional allegations from GE's securities filings since the previous letter, the filing of the New York State Class Action, the 2019 Securities Class Action, and the Touchstone Action, as well as the filing of the Consolidated Amended Class Action Complaint in the New York State Class Action.  Ms. Nicholson repeated her request for information about the composition of the Special Committee and for confirmation that GE had received the executed tolling agreements.  A copy of Ms. Nicholson's April 18, 2019 letter is attached hereto as Exhibit 7.

172.    Ms. Skaistis finally responded on May 31, 2019, providing the make-up of the Special Committee.  The Special Committee as originally constituted consisted of Defendants Lavizzo-Mourey, Seidman, and Horton. Reynolds, who was elected to the Board in December 2018, replaced Horton as the third member of the Special Committee "in light of Mr. Horton's other responsibilities on the GE Board."  Ms. Skaistis informed Ms. Nichsolson that the Special Committee was still investigating the allegations in the Litigation Demand and rejected Plaintiffs' request for tolling agreements.  A copy of Ms. Skaistis' May 31, 2019 letter is attached hereto as Exhibit 8.

173.    Thereafter, on August 26, 2019, Ms. Nicholson provided additional updates to the Board and Special Committee concerning the events and circumstances laid out in the Litigation Demand and information concerning further negative events at the Company that necessitated the

Special Committee's attention, including the Markopolos Report and the filing of the Amended Complaint in the 2019 Securities Class Action.  Ms. Nicholson also sent draft proposed corporate governance reforms "designed to strengthen the Board's oversight of the Company's operations, compliance, enterprise risks, and disclosures and assist the Special Committee's consideration of the Stockholders' request in the Litigation Demand. . . ."   Among other things, the letter specifically proposed amending the Company's corporate governance to require reporting to the Board regarding GE's business segments, the creation of a disclosure committee, the hiring of a chief compliance officer, and strengthening the Company's ability to clawback and/or recoup compensation paid to wayward fiduciaries.  A copy of Ms. Nicholson's August 26, 2019 letter is attached hereto as Exhibit 9.

174.   On October 9, 2019, Ms. Nicholson wrote to Ms. Skaistis, to follow-up on the August 26 letter, to which Ms. Nicholson had received no response.  Ms. Nicholson attached to her October 9 letter a copy of the Securities Class Action Court's opinion and order denying defendants' motion to dismiss, as well as the Second Amended Complaint that had been filed in the 2019 Securities Class Action.  A copy of Ms. Nicholson's October 9, 2019 letter is attached hereto as Exhibit 10.

175.   On November 15, 2019 – nearly one year after the Litigation Demand was first sent to the Company, and having not received a response to her October 9 or August 26, 2019 letters – Ms. Nicholson wrote to Ms. Skaistis and provided additional updates, including the New York State Class Action court's denial of defendants' (except KPMG) motion to dismiss on standing grounds and, the filing of the Fifth Amended Consolidated Class Action Complaint in the Securities Class Action.  A copy of Ms. Nicholson's November 15, 2019 letter is attached hereto as Exhibit 11.

176.    Ms. Skaistis responded on November 15, 2019, stating that the Special Committee was still in the process of investigating and that she anticipated it would "take several more months for the Committee to complete its work."  A copy of Ms. Skaistis' November 15, 2019 letter is attached hereto as Exhibit 12.

177.    Nearly a year later, having received no further response from the Company, the Board, the Special Committee, or its counsel regarding the Special Committee's investigation, Ms. Nicholson wrote to Ms. Skaistis on November 5, 2020 to follow-up on the investigation and provide an additional update, including regarding the Company's receipt of the Wells Notice from the SEC.  The letter also reasserted Plaintiffs' proposed corporate governance reforms, advising that these reforms would "provide a useful framework for appropriate action to remedy the serious harm caused to the Company and prevent a reoccurrence of such harm in the future."  A copy of Ms. Nicholson's November 15, 2020 letter is attached hereto as Exhibit 13.

178.    Ms. Skaistis responded on November 17, 2020, stating – again – that the Special Committee was still investigating the issues raised in the Litigation Demand and that it "anticipates being in a position to report its final recommendations to the full Board by the end of this year." A copy of Ms. Skaistis' November 17, 2020 letter is attached hereto as Exhibit 14.

179.    On December 10, 2020, Ms. Nicholson wrote to Ms. Skaistis and provided an update regarding the SEC Order and the Company's agreement to pay $200 million to the SEC to settle the claims raised therein.  A copy of Ms. Nicholson's December 10, 2020 letter, which includes the SEC Order, is attached hereto as Exhibit 15.

180.    On December 31, 2020, after nearly two years and countless updates from Plaintiffs regarding the additional evidence of and ongoing damage to GE caused by the Individual Defendants' wrongdoing – including an astounding $200 million payment to the SEC and the SEC

Order – the Demand Defendants finally responded to the Litigation Demand.  A copy of the December 31, 2020 response is attached hereto as Exhibit 16.

181.    The Demand Defendants' response advised that on December 8, 2017, the Board delegated to the Audit Committee responsibility for investigating the allegations raised in the Litigation Demand, which at that time was comprised of Defendants Schapiro, Beattie, Henry, Mulva, and Rohr.  Subsequently, Defendants Schapiro, Henry, and Rohr left the Audit Committee and were replaced by Defendants Brennan and Seidman.  On November 9, 2018, the Board decided to delegate such investigation to a Special Committee comprised of Defendants Lavizzo-Mourey, Hortron, and Seidman.  Defendant Horton was later replaced on the Special Committee by Defendant Reynolds.

182.    Incredibly, the Demand Defendants' response indicated that they were refusing to undertake *any* of the actions detailed in the Litigation Demand purportedly because "the Company has no sound legal basis" to assert such claims and that, "even if there were a sound legal basis to assert claims, any such litigation would not be in the best interest of the Company and its stockholders."  Further, the Demand Defendants rejected "the other demands for action by the Company, including seeking clawback and instituting corporate governance and compliance reforms."  In fact, the only actions the Demand Defendants committed to do in response to the serious wrongdoing alleged in the Litigation Demand and significant damage the Company had sustained as a result thereof were woefully deficient; the Demand Defendants stated that they would only have management merely "***consider and report back*** to the Board by June 18, 2021" on ***potential*** enhancements to the Company's clawback policy and the use of diagnostics to measure the Company's culture "in light of recent trends in corporate governance best practices."

183.    The Demand Defendants' delayed and perfunctory response is impossible to

reconcile with the fact that the Securities Class Action court has already found such allegations sufficiently plausible to pass muster under heightened pleading requirements and, just weeks before, the Company paid $200 million to settle similar claims brought by the SEC.  The only possible conclusion is that the Demand Defendants acted in bad faith and in breach of their fiduciary duties in purporting to investigate and consider the Litigation Demand, while in fact intending to reject the Litigation Demand from the outset.

184.    Because the Demand Defendants have wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused GE.

## SPECIFIC FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

185.    The Individual Defendants had stringent fiduciary obligations to GE and its shareholders.

186.    By reason of their positions as officers and/or directors of GE and because of their ability to control its business and corporate affairs, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage GE in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of GE and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interests or benefits.

187.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial condition.

188.    The Individual Defendants, because of their positions of control and authority as

directors and/or officers of GE, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with GE, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of GE.

189.    Further, each of the Individual Defendants was and is bound by GE's Code of Conduct (the "Code"), which states that "GE holds its leaders accountable for creating a culture of compliance" and further underscores in pertinent part:

> In every market in which GE operates, GE must comply with an ever-expanding array of laws and regulations that are often being enforced more aggressively than ever before.  In some cases, laws made by one country seek to regulate activities that take place outside of that country.  This environment demands that every employee and leader be committed to regulatory excellence.

190.    The Demand Defendants also had and have a duty to conduct a good faith, reasonable, and objective investigation into the allegations in the Litigation Demand.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

191.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

192.    During all times relevant thereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to mislead the investing public, including shareholders of GE, regarding the Company's financial health and growth prospects.  In furtherance of this plan, the Individual Defendants, collectively and individually, took the actions

set forth herein.

193.    The purpose and effect of the Individual Defendants' course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and investment risk profile.

194.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DERIVATIVE AND DEMAND ALLEGATIONS

195.    Plaintiffs bring this action derivatively for the benefit of GE to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and betting thereof, by the Individual Defendants.

196.    GE is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

197.    Plaintiffs will adequately and fairly represent the interests of GE in enforcing and prosecuting its rights.

198.    Plaintiffs are shareholders of GE and have continuously owned stock in the Company since at least June 1, 1983.

199.    On November 14, 2018, Plaintiffs made the Litigation Demand on the Board to independently investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging GE.

200.    Upon receiving the Litigation Demand, the Board had an affirmative duty under New York law to conduct a good faith, reasonable, and objective investigation into the allegations in the Demand and to reach a good faith, reasonable, and objective conclusion regarding the potential claims detailed in the Litigation Demand.

201.    However, after over two years of stringing Plaintiffs along, the Demand Defendants finally responded on December 31, 2020 that they were refusing to undertake any of the actions detailed in the Litigation Demand purportedly because "the Company has no sound legal basis" to assert such claims and that, "even if there were a sound legal basis to assert claims, any such litigation would not be in the best interest of the Company and its stockholders."

202.    The Demand Defendants' perfunctory response did not address (and is impossible to reconcile with) the fact that the Securities Class Action court has already found such allegations sufficiently plausible to pass muster under heightened pleading requirements and, just weeks before, the Company paid $200 million to settle similar claims brought by the SEC.  The only possible conclusion is that the Demand Defendants acted in bad faith and in breach of their fiduciary duties in purporting to investigate and consider the Litigation Demand, while in fact intending to reject the Litigation Demand from the outset.

203.    Because the Demand Defendants have wrongfully refused the Litigation Demand, Plaintiffs now commence this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they caused GE.

204.    Prosecution of this action, independent of the current Board, is in the best interest of the Company.

205.    The wrongful acts complained of herein subject, and will continue to subject, GE to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (Against all Individual Defendants)

206.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth therein.

207.    Each of the Individual Defendants owed and owe GE fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants owed and owe GE the highest obligations of good faith, fair dealing, loyalty, and due care.

208.    In addition, as part of their duty to exercise good faith and diligence in the administration of the affairs of the Company, the Individual Defendants had and have a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts, as well as other material facts bearing upon its operations and financial condition.

209.    Each of the Individual Defendants violated and breached their fiduciary duties. More specifically, the Individual Defendants knowingly, recklessly, or with gross negligence: (i) caused or permitted GE to hide the truth about the Company's true financial and operating condition, by causing the Company to omit the truth about GE Capital's LTC exposure, and by causing the Company to create an illusory revenue recognition scheme in order to meet its earnings targets; (ii) caused or permitted GE to maintain inadequate risk exposure, financial controls, and internal controls over its public disclosures; and (iii) caused the price of GE's securities to be artificially inflated, thereby subjecting GE to massive liability to the purchasers of such securities and to possible civil and/or criminal liability stemming from investigations by the SEC and DOJ.

210.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, GE has sustained substantial damages, including direct monetary damages and

damages to its reputation and goodwill in the capital markets.  As a result of the misconduct alleged herein, the Individual defendants are liable to the Company.

211.    Plaintiffs, on behalf of GE, have no adequate remedy at law.

### COUNT II
### WASTE OF CORPORATE ASSETS
**(Against the Waste Defendants Defendants)**

212.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth therein.

213.    As a result of the Waste Defendants' conduct, by failing to properly consider the interests of the Company and its public shareholders and by failing to conduct proper supervision, the Waste Defendants have cause GE to waste valuable corporate assets by paying compensation and/or bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend the Individual Defendants' actions.

214.    Because of the waste of corporate assets, the Waste Defendants are liable to the Company.

215.    Plaintiffs, on behalf of GE, have no adequate remedy at law.

### COUNT III
### UNJUST ENRICHMENT/CONSTRUCTIVE TRUST
**(Against the Unjust Enrichment Defendants)**

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth therein.

217.    The Unjust Enrichment Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to GE, and/or have aided and abetted such unjust enrichment.

218.    The Unjust Enrichment Defendants should be required to account for and disgorge

all realized monies, profits, commissions, bonuses, and gains (including directors' fees and related compensation for attending meetings and rendering other services) which they have obtained and will unjustly obtain at the expense of GE, and a constructive trust should be imposed thereon for the benefit of the Company.

219.    Plaintiffs, as shareholders and representatives of GE, seek restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

220.    Plaintiffs, on behalf of GE, have no adequate remedy at law.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(Against the Demand Defendants)**

221.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth therein.

222.    On November 14, 2018, Plaintiffs served the Litigation Demand on the Board, which asked the Board to independently investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging GE.

223.    Upon receiving the Litigation Demand, the Demand Defendants had an affirmative duty under New York law to conduct a good faith, reasonable, and objective investigation into the allegations in the Demand and to reach a good faith, reasonable, and objective conclusion regarding the potential claims detailed in the Litigation Demand.

224.    However, after two years of stringing Plaintiffs along, the Demand Defendants finally responded on December 31, 2020 that they were refusing to undertake any of the actions detailed in the Litigation Demand purportedly because "the Company has no sound legal basis" to

assert such claims and that, "even if there were a sound legal basis to assert claims, any such litigation would not be in the best interest of the Company and its stockholders."

225.    The Demand Defendants' perfunctory response did not address (and is impossible to reconcile with) the fact that the Securities Class Action court has already found such allegations sufficiently plausible to pass muster under heightened pleading requirements and, just weeks before, the Company paid $200 million to settle similar claims brought by the SEC.  The only possible conclusion is that the Demand Defendants acted in bad faith and in breach of their fiduciary duties in purporting to investigate and consider the Litigation Demand, while in fact intending to reject the Litigation Demand from the outset.

226.    As such, the Litigation Demand has been wrongfully refused, and the Demand Defendants have breached their fiduciary duties.

## COUNT V
## VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14A-9 PROMULGATED THEREUNDER
### (Against the Exchange Act Defendants)

227.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth therein.

228.    This claim is brought derivatively on GE's behalf for the Exchange Act Defendants' violations of Section 14(a) of the Exchange Act and Rule14a-9 promulgated thereunder.

229.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

230.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

231.    The 2017 Proxy Statement stated that the Board's role was "overseeing risk management and *understanding the most significant risks facing the company*" and touted that GE had "added directors with experience in risk management and oversight."  The 2017 Proxy Statement further represented that "GE uses a broad set of financial metrics to measure its performance, and *accurate financial reporting and robust auditing are critical to our success*."

232.    These statements were false and misleading and omitted material information because the Board had in fact consciously disregarded its oversight responsibilities with respect to the accuracy of GE's financial reporting and the significant risks posed by the Company's crumbling LTC insurance policies in its GE Capital division and illusory revenue recognition scheme in its GE Power business.

233.    In the exercise of reasonable case, the Exchange Act Defendants should have known that the 2017 Proxy Statement contained misleading information and/or omitted material information.

234.    The misrepresentations and omissions in the 2017 Proxy Statement were material to Company shareholders in voting on the 2017 Proxy Statement.

235.    The Company was damaged as a result of the Exchange Act Defendants' material

misrepresentations and omissions in the 2017 Proxy Statement.

236.    Plaintiffs, on behalf of GE, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of GE, demand judgment as follows:

A.  declaring that each of the Individual Defendants breached his or her fiduciary and other duties owed to GE and its shareholders as alleged herein;

B.  directing the Individual Defendants, jointly and severally, to account for all loses and damages sustained by GE caused by reason of the acts and omissions complained of herein;

C.  awarding GE money damages against all Individual Defendants for all losses and damages sustained and to be sustained by the Company and its shareholders as a result of the acts and omissions complained of herein;

D.  directing the Individual Defendants to account for and to remit and disgorge to GE all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation, and GE common stock sale proceeds together with the earnings upon such amounts by which such Defendants were unjustly enriched and imposing a constructive trust thereon as well as the earnings such Defendants have received thereupon;

E.  ordering the Company to take all necessary actions to reform and improve its corporate governance, risk management, compliance, and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

F.  awarding GE pre-judgment and post-judgment interest as allowed by law;

G.  awarding GE punitive damages;

H.  awarding Plaintiffs' attorneys' fees, expert fees, consultant fees and other costs and expenses; and

I.  granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: January 8, 2021                      Respectfully submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Melinda A. Nicholson*
MELINDA A. NICHOLSON (MN-6251)
MELISSA HARRIS (MH-3553)
NICOLAS KRAVITZ
EDA AYRIM WALKER
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Melinda.Nicholson@ksfcounsel.com
Email: Melissa.Harris@ksfcounsel.com
Email: Nicolas.Kravitz@ksfcounsel.com
Email: Eda.Walker@ksfcounsel.com

-and-

J. RYAN LOPATKA
**KAHN SWICK & FOTI, LLC**
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

*Counsel for Plaintiffs Stephen J. Burden and Jacqueline S. Burden*

65